Good morning, Your Honors. Richard Pearl for the Plaintiff Appellant. I'd like to reserve two minutes forward. We have briefed this issue. The issue is presented here extensively and I would most like to use my eight or ten minutes to answer any questions the Court may have. I do have a few points I want to emphasize. Why don't you start with those and then we'll take them on. First, I want to emphasize to the Court that we thought long and hard about this appeal. We recognize the great discretion the trial courts must have in determining reasonable attorney's fees. But there are very important legal principles presented by the district court's decision in this case that we feel were incorrectly decided or overlooked. And the first of those is the issue of what is the effect of not obtaining all the relief you seek or losing related claims. What the district court did was take the Hensley formula, which everyone has recognized, and gone from the presumption that the load star is reasonable, which is also an accepted principle, to a presumption that the load star is unreasonable unless the plaintiff obtains complete vindication or total victory. And we submit that that presumption, that the load star is unreasonable unless you obtain complete vindication and total victory, is both inconsistent with the case law and, more importantly, inconsistent with the purposes of the civil rights fee-shifting statutes. The purposes of those statutes, and I think this is well established, is to ensure competent attorneys that if they vindicate these important rights with substantial relief, they will be fully compensated for their reasonable efforts just as they would be from a fee-paying client. The case law recognizes repeatedly that the mere fact that you raise related claims or that you did not obtain all the damages you sought does not make an otherwise reasonable fee, per se, unreasonable. Your client, excuse me, your client was dismissed, I gather, essentially. Is that right? What was the term used? I've forgotten. Oh. She wasn't dismissed. She retained her employment throughout these proceedings. She had an abeyance. Is that the term you're looking for? Yeah. What does that mean exactly, an abeyance from employment? It's something, as I understand it, it's something less than a suspension, but it has the effect of a suspension in that she cannot continue to operate while the abeyance It's sort of time out while we investigate. Is she still obeyed, so to speak? Oh, no. That was the abeyance was terminated a month after. So she's now working. She's been working the whole time. Okay. One of the relief, one of the, I guess, grounds for relief that you were seeking but did not achieve was a reversal of that abeyance. Is that right? Not specifically, no, Your Honor. There was no specific claim that the abeyance was unconstitutional or illegal or unlawful or any of that sort. There were two claims for relief, gender discrimination and hostile work environment. And the abeyance, the validity or legality of the abeyance was important to both claims, as the trial court found. It was probably more important to the discrimination claim than the hostile work environment claim. But the district court expressly found that most of the work on the abeyance issue aided the plaintiff in proving her hostile work environment. But you were not successful on the abeyance issue. Well, there wasn't a separate abeyance issue. And what the district court found expressly. All right. Well, tell me exactly. What did you win and what did you lose? We won a hostile work environment claim and $300,000 in compensatory data. What did you lose? We didn't win the gender discrimination claim or the economic damages that were sought as part of that claim. And we didn't win an injunction mainly because the ---- And what did the injunction go to? The injunction really mainly went to cleaning up her record. She was concerned that the abeyance was still in her record. That's where I got ---- that's why I was asking. That had to do with the abeyance. Right. All right. All right. That's the issue, it seemed to me, that I wasn't clear on. And I think maybe the court below was focusing on it. The abeyance seemed to be a great concern. And the equity action, the injunction, was to erase that from the record, as I understand it. Yes. So the professional issue wouldn't have that. The district court did not grant that injunction. No. And so that all of a sudden becomes very important to the case as it's briefed. What is your position on that? She got $300,000. That's fine. But there's still something on the record that she wanted to have erased which didn't happen. Well, I have several positions. There are several facts that are important on that case, on that issue. First of all, the injunction only took up 26 hours of time. So denying the plaintiff compensation for 537 hours of time reasonably spent based on work that only took 26 hours is not logical or consistent with the purposes. Second, the plaintiff did not lose the abeyance issue, as the district court found. The district court found the jury could well have believed that the abeyance was discriminatory, but that there was no damages as a result of it. So it's not like the plaintiff came in and said, I want to show that the abeyance is unlawful, and the jury said, no, it was lawful. The jury never reached the issue. Well, I understand. But it was specifically brought to the lower court through your request for equity action, which you lost specifically. Well, the injunction was a post-trial motion based on – and it was lost not just because the abeyance wasn't proved unlawful. As I understand it, the department took the – the secretary took the position that the abeyance isn't even in the record anyway, because it's not an adverse personnel action. It is something else. Is that in the record? I believe it is. No, I didn't ask you if he said it. I said, is it in the record? I believe I read that it was in the record. I can't cite the checklist. I didn't get it in the record, and that would be an important issue. You can't ask him. He'll tell if it's in the record. Perhaps on rebuttal. Pardon? On rebuttal, you may not. I will do that. I'm sorry. I will try and clarify that. But that was my understanding, was that the abeyance may not have even been in the record at that point, and therefore, the trial judge wasn't clear that he – that it was even necessary to issue an injunction. They kind of took the position it's like a police officer that's involved in a shooting, and they suspend them as a matter of course while they investigate. And then if the police officer is exonerated, they just go back to work. It's not considered an adverse action. It's just something they do. Is that what you're telling me? That's – I understand what the position the Secretary took. And it's something less than a suspension. It's less serious than a suspension. There's less of a quantum of evidence required to get to the abeyance than a suspension. So what do you do when you're on abeyance? Do you go to work every day and do your job, or do you do – go to work and sit in a chair? I can't tell you that. Okay. It's not important, but you've got my curiosity. Maybe you could tell us about the magistrate judge's determination that the fees were too high. Apparently, the magistrate judge based his determination upon other fees that he had awarded in what he perceived to be similar circumstances, and he decreased the highest from 475 to 425 and so on and so forth. What is wrong, from a legal point of view, the magistrate judge relying upon his earlier work, where he found what was a reasonable fee in a similar case that occurred about the same time? From a position, legal position, can he do that? Some circuits say he can't. I don't ask this Court to issue a similar rule, but in this case, where there is overwhelming evidence that plaintiff's rates meet the applicable standard, eight declarations that stated that plaintiff's requested rates are in line with those prevailing in the community, the decisions that the district court relied on were never raised by the defendant. They were only stated in the order. They weren't raised at the argument. They weren't raised by the defendant in its briefing. They were only stated in the order. So the plaintiff had no opportunity to distinguish those cases or argue why they shouldn't apply. And the decisions were, in some cases, a year or two old. Did you bring a motion for reconsideration? No, we did not. Is that a waiver? I don't believe so. I mean, in our, in my experience, reconsideration is not encouraged in these kind of motions. And we thought there were other reasons for having the rate determination reversed besides that, but that was simply one more reason why the district court's rate determination was an abuse of discretion. I think the main reason the rate determination was an abuse of discretion was the district court's focus on whether Mr. Lee and his firm had actually charged the rates they were claiming. And that simply is not the standard. The district court seemed to make that a prerequisite for awarding civil rights attorneys a prevailing market rate that they establish that they charge some fee-paying clients that rate. That's not the standard set out in Blum. It's not the standard approved by this Court in Davis. And it makes little sense in the civil rights context where most civil rights lawyers and civil rights clients don't pay market rate paying, market rates. Well, isn't the crux of your argument, though, that he just basically made an arbitrary determination in your view and just lopped off 25 percent? On the first part of it, the partial success? Yeah. I don't believe it was arbitrary, but I do believe it was contrary to the legal standards. So you don't argue that it was arbitrary? I think he thought about it. I think it's contrary to the legal standards because there is a presumption that the lodestar is reasonable, and I don't believe he considered that. And I don't believe he considered the importance of the case or the statutory rights that were involved. And I don't believe he considered other important factors that the case law has established and particularly, I think, and I want to make this point, I'm over my time, the settlement history, because I think that shows more than what a lawyer says to a jury, whether you have achieved sufficient success or limited success. And the settlement history in this case was undisputed. The defendant never offered more than $25,000. The plaintiff obtained. Including fees? Including fees. The plaintiff obtained $300,000, actually a verdict for $500,000. The defendant, the plaintiff offered to settle for much less than they ultimately attained. So when you're going to evaluate whether the plaintiff was successful, I would submit that the settlement history is the most important factor, much more important than what was asked of the jury. And I'll reserve, if I still may, my two minutes for rebuttal. Thank you. Roberts. Clear from the Secretary. Good morning. My name is Claire Cormier. I'm an Assistant United States Attorney, and I represent the Secretary of the Department of the Air Force, who now is Michael Winn. The plaintiff in this case, Dr. Pauline Velez, won on one of her claims at trial, but she lost on the claim that consumed the vast majority of the time and effort, as recognized by the district court. And this was after she had already lost on two claims on summary judgment. She also did not receive whole categories of relief that she had sought. She received no economic damages, and her requests for the various types of injunctive relief were all denied. Nevertheless, the district court still awarded her attorneys $624,631.30 in fees and costs. The Air Force has paid that full amount ordered by the district court, but Dr. Velez's attorneys want more. This is not a case where the district court took a simplistic meat-ax approach to the fees award. The district court didn't say, well, she won on one out of four claims, so I'll only give her 25%. It didn't even say, well, she won on one of the two that went to trial, so I'm just going to give her 50%. Let me ask you a question, counsel. Had she won on any other of the claims, hypothetically, would she have gotten $0.10 more in damages? That would have been up to the district court. How would it be up to the district court? She already capped out above the $300,000. Would she have gotten a dime more of damages, regardless of if she got one on the other claims? Well, if she had won on the disparate treatment claim, she could have obtained the economic damages that she requested. She requested somewhere between, excuse me, $700,000 and $1.4 million in economic damages. At the end of the closing argument, Mr. Lee specifically mentioned those economic damages and asked the jury to award every penny of that $1.4 million, and she did not receive that. She could have received ---- She could have received more than $300,000. An awful lot more than $300,000. Thank you. She also could have received the injunctive relief that related to the disparate treatment claim. Do you agree that the position of the Secretary was that the request for injunctive relief was moot because it wasn't, the abeyance was not in her record anyway? No, the request for injunctive relief was not moot. The abeyance ---- Let me ask you more directly. Was the abeyance in her record or not? Let me ---- When hospitals made inquiries to the Air Force asking if Dr. Velez had any adverse credentialing action, the answer was no. And that actually did happen, and that's one of the reasons why I believe the jury found this not to be an adverse employment decision. The abeyance, as described in our brief, Your Honor, is not an adverse credentialing activity. That doesn't mean that it's like the police officer who is involved in a shooting and who is exonerated. There was not adverse activity taken against her after the abeyance. However, as described in our brief, there were concerns raised, and there were concerns that still existed after the abeyance and the reviews that related to it. How do you expunge a concern? I mean, is that, is there, that seems to me you can't, you can't, that's not relief that could be granted. What they wanted was a record clean. And what you're telling me is, as to the outside world, her record was clean. But is there something in the record now that the, could the district court have ordered effective relief on this? It sounds like not. Well, Dr. Velez didn't work for the Air Force. That was one of the complicating factors here. And that was one of the reasons why we felt the case never should have even gone to trial, because of the employment relationship. However, we lost on that, and we didn't appeal it. So because of that unusual relationship, it's not a situation where the Air Force is in possession of her personnel file. So we don't know what is in the VA's personnel file relating to Dr. Velez. And it wasn't, and it's not in the record? Not that I'm aware of, Your Honor. One of the things that appellant has focused on in their briefs is their position that the district court judge presumed that the lodestar is unreasonable unless there's complete vindication. That is a significant over-reading and selective reading of what the district court did. They've stated that the district court judge never said that results, they've said that the district court never asked itself, do I have to make a reduction? The district court just asked, how much? And that's just frankly not true. The district court stated at page 583 of the excerpts of record, quote, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award? The court then goes on for three pages discussing why it's choosing to make a reduction. And then it gets to the sentence quoted out of context by the appellant that states, the court must now decide what reduction is warranted. Had the court inserted the words, what reduction, if any, is warranted, apparently that would have been acceptable to the appellant. And in fact, at the hearing on the attorney's fees motion, the judge said, quote, I'm going to have to take a look at the Lodestar issue and apply the burdens to see what adjustments, if any, are appropriate to the Lodestar. And that's at the excerpts of record at page 547. Well, counsel has already conceded that the judge was not arbitrary. Let me ask you this. One of their main points on appeal is that the magistrate, in this case, improperly reduced their hourly fee in applying the Lodestar based upon the fact that they apparently did not or could not show that they billed the clients at that rate. What's your response to that? Well, this is a very different situation from the cases that are cited by appellant on that issue. For example, in the Mendenhall case, the attorney said, I'm only charging this client $150, but I charge other clients who can afford it $300. That's not the situation here. There was no invisible evidence that Dr. Vella's attorneys charged any of their clients the $475 that was requested. The attorney stated at the hearing that that was the case, but the judge found quite properly that that was not admissible evidence. In addition, the court also noted that the declaration submitted by the other attorneys saying this is a reasonable hourly rate, this is customary, and in some instances this is what I charge, the court couldn't tell from those whether those were the rates that were actually charged as opposed to the hourly rates that people say, this is my hourly rate, but I'm going to do you a favor and give you a discount. Well, did you present evidence as to what the appropriate hourly rate should be? We did present evidence in a declaration in support of our motion that the district court chose not to use that to any degree. So where did the district court get the rate that was used here? Just kind of out of the sky or just personal knowledge or where did it come from? It came in part from the declaration submitted by plaintiff, as discussed by the district court in its order. It also came from several Northern District of California attorneys' fees orders, at least two of which involved Mr. Pearl. So there was a basis for it? Yes. In the record? Yes. In the record. Well, in the district court order. Right. The court. The problem I have, and maybe I just missed it in the record, is that the other orders are part of the record. I didn't see them as part of the record. Is that just my concern? No, but they're cited with their docket numbers, and those are judicially noticeable as judicially noticeable information. And as I stated, two of them involved Mr. Pearl. They were decided within months of the hearing on the attorneys' fees motion, actually between Mr. Pearl's declaration and the hearing. And Mr. Pearl had stated that his reasonable hourly rate was the same as Mr. Lee's, $475 an hour. And the district court in those two cases had found that Mr. Pearl's reasonable hourly rate was $400 per hour, which is actually less than the district court awarded to Mr. Lee and Mr. Yamauchi in this case. Well, we're a couple of years away from total electronic filing, so it's not so easy for us to get those orders. However, there's nothing that says that a district court judge. No, but it makes it hard for us to evaluate, is my only point, without those orders in the record. It's difficult for us to examine that finding against the record evidence. Which is why, if the appellant had a problem with it and a motion for reconsideration would have been appropriate, then it could have been flushed out. I would have to agree that motions for reconsideration on fee issues aren't particularly encouraged in the district court. Neither are appeals. In addition, I'm not aware of any case in this circuit or by a Supreme Court that says that a district court judge can't consider its own experience. Judge Chen has had a lot of experience in dealing with attorneys' fees motions. He was the attorney – excuse me. He was the judge on this case for more than two years. He observed the work that was done. He observed what succeeded, what didn't. And he made reasonable discretionary determinations based on that information as well as the information put into the record. And there's nothing that says that that's inappropriate. Let me ask you on the 25 percent decrease of the lodestar. Okay, there's four claims that are made. And there's a difference under our law under the Dang case and the others. It makes a difference if they're related or unrelated. It seems to me that, if I understand correctly, if they're unrelated, then you can begin to cut down the lodestar. But if they're related, you can't. If that's a true understanding of the Ninth Circuit cases, I'm concerned the magistrate judge determined that all four claims were related because they involved a common – his words – involved a common core of facts that were based on related legal theories. Hasn't he, by that finding, indicated that he erroneously decreased the 25 percent because all four were related claims? Not at all, Your Honor. I see I'm out of time, so I'll focus this on just two cases. One, Hensley. The second – the last step of Hensley specifically relates to the situation where claims are related. There's the separate – the prior step where you take out the things that are unrelated. Once you – if you find that they're related, then you deal with the last step of Hensley to look at these results obtained. And this Court in Webb v. Sloan in 2003 has agreed with that. The Webb court stated that if it's impossible to isolate the work on unsuccessful claims, then a reduction for limited success is appropriate. That is exactly the situation here. This Court has supported that on numerous occasions, and so has the United States Supreme Court. Any further questions?  We'll give you two minutes for rebuttal. First, Mr. Lee has provided me with a cite to the record where they state that the Valese credential file reveals no adverse data on file, and that is the defendant's supplemental excerpts of record at 79 and 80. At what? 79 and 80, pages 79 and 80 of the supplemental excerpts of record. Let me start with the – with the rate arguments because, first of all, the Mendenhall case may have had a fact that the plaintiff charged some other clients the rate he was seeking, but that's not what the Court held was the proper standard. The Court held that the rate determination should be based on the declarations of attorneys doing comparable work, stating what is the rate normally charged for that type of work. That is the holding of the Mendenhall case. And the Davis case was even more specific because this exact argument came up. I worked on the Davis case. There were two private civil rights attorneys who never charged clients more than a small amount. The city in that case argued that that should cap the fees they are entitled to. The district court said, no, they're entitled to the prevailing market rates for complex litigation in this district, and this Court affirmed. And that decision has never been questioned or overruled. In terms of the declarations, again, Mendenhall says you can't set too high a standard. You can't ask attorneys who are saying what is the market rate to bring in all their bills to prove that what they say is what they charge is what they actually charge all their clients. That's simply too high a standard. Here we had eight attorneys saying that this is their market rate and this is the reasonable by the courts, and the district court simply disregarded that. The defendant mentioned their own evidence. In fact, the survey that they presented, as the district court found, supported the plaintiff's rates. It showed a range of rates that included Mr. Lee and Mr. Yamauchi's rates, and the district court expressly found that because of their skill and experience, they would be entitled to fees at the high end of that range, yet it disregarded that evidence as well. The allegations about my declaration are new. I can certainly state to you that in my declaration I listed a number of cases in which the rate I was claiming was reasonable was found to be reasonable. In terms of partial success, Hensley does not countenance a district court to simply say if you didn't get everything you asked for, the district court has carte blanche to reduce the fee by some considered percentage. But it seems here, counsel, that if you were seeking a million whatever dollars and economic damages, and you received the cap of $300,000, that the significant part of your case, you lost. Well, in this case, there's two points to that. First of all, the district court did find that all the time that was spent, the lodestar, all the time that was spent to obtain the result that was obtained, $300,000, was reasonably spent on that claim and related claims. I don't have a problem with that. I'm asking you about the other claim, which was the one that, I mean, I assume you would have been thrilled to death to have won that claim and lost the other one. I mean, you know, I mean, a million dollars is a lot more money than 300,000. Right. But let me go back to this specific case, because the claim for economic damages in this case was what the courts have frequently recognized as a novel but credible claim. Dr. Velez never lost her employment. She had no hard economic damages. The argument was that because of these discriminatory actions, she faced economic loss in the future if she went and applied for another job. And the jury presumably found that that simply wasn't or hadn't been proved. She still continued working for nine more years after these actions with the Air Force or the VA. The fact is, though, that simply asserting that claim doesn't mean that 537 hours of time were unreasonable. And if plaintiff's counsel are told, if you come to a jury and ask for more damages than the plaintiff ultimately receives, you're going to get your fee slashed by that percentage or some significant percentage, no matter how reasonably you've worked, no matter what the settlement positions were, no matter how essential it was for you to go to trial, no matter how substantial the results you obtained are, you're going to be creating conflicts between lawyers and clients and, in the end, thwarting the purposes of the civil rights fee-shifting statutes. That's why I submit the lodestar is presumed reasonable. And there should be something more than simply that you didn't get what you asked the jury for to justify such a significant reduction. And, in fact, Hensley says the fact that you did not obtain all the relief sought does not necessarily require a lodestar reduction. Well, isn't there kind of a policy issue here as well? I mean, you don't want to be encouraging plaintiffs to throw into every complaint every possible conceivable cause of action, even though they don't have the essence of evidence to support it, on the theory that it doesn't make any difference anyway, because even if I win just one little thing, I'm going to get all my attorney's  I would agree with that, Your Honor. And if the claim is not credible or if the plaintiff obtains only nominal damages or if an inordinate amount of time is spent on a part of the case that wasn't helpful to anything else, I would agree with you. But in this case, the trial court expressly found that the work done on the abeyance issue and the related reviews, which are the core of the economic damages argument, was useful and necessary to the prevailing claim. And, in fact, they didn't lose the abeyance issue. They never asked for a specific finding on the abeyance issue. So in this case, the fact that plaintiffs asserted a claim for economic damages didn't add significantly to the amount of time spent at trial, as the district court found. What the district court essentially did was say, we're going to penalize you for asking for more damages than you got, no matter how much it affected your reasonable hours. And that's, in my view, contrary to the purposes of the statute in the case law. The case law looks at what hours were reasonably expended to obtain the substantial relief that was sought. And if you don't compensate plaintiff's attorneys for those hours, you're not going to have plaintiff's attorneys taking these cases and you're going to be discouraging them from advocating zealously on behalf of their clients. Well, I assume that much of the work was interrelated, but was there some work directed specifically and only at the economic damage portion of your case? I believe there was, but it was minimal, as the district court found. The district court said the amount of time that would have been spent if only a hostile work environment claim had been brought, the amount of time, additional time that would have been saved was relatively minimal. I can't remember the exact words, but it did find that. So that this wasn't a situation where most of the case was spent on the economic damages claim. The economic damages flowed from the adverse employment actions, the abeyance and the other reviews, which were, as the district court found, useful in proving the hostile work environment claim. Any further questions? Thank you. Thank you very much. The case just shortly submitted. Thank you both for your arguments.
judges: Wallace, Thomas, Ezra